Charles C. Dickinson v. Commissioner.
Dickinson v. Comm'r
Docket No. 3839. United States Tax Court
1945 Tax Ct. Memo LEXIS 309; 4 T.C.M. (CCH) 190; T.C.M. (RIA) 45053; February 7, 1945
*309 Petitioner for many years has been the owner of large acreages of coal lands in the State of West Virginia. In the development and exploitation of these coal lands he has organized several corporations of which he was either the sole stockholder, except qualifying shares, or was the principal stockholder. In 1929 petitioner organized a corporation to take over a coal storage and marketing business which he had established in Chicago, Illinois, about one year before. This corporation operated unprofitably for about 10 years, although it did serve as an outlet for about three-quarters of a million tons of coal from mines operated in West Virginia by corporations of which petitioner was either the sole stockholder or the principal stockholder. In 1939 petitioner's stock in this corporation became worthless and debts owing to him by it became worthless. The Commissioner allowed these losses as deductions to petitioner in 1939 but refused to allow petitioner the privilege of carrying forward the remainder of such losses, not used in 1939 to offset income, as net operating losses under sections 23 (s) and 122 of the Internal Revenue Code. Held, the losses thus sustained *310 by petitioner were not operating losses within the meaning of the applicable statute and the Commissioner is sustained under authority of Dalton v. Bowers, 287 U.S. 404. Charles W. Moxley, Esq., 1601 Kanawha Valley Bldg., Charleston, W. Va., for the petitioner. E. M. Wolfe, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioner's income tax for the year 1940 of $2,482.72. The deficiency is due to two adjustments to net income as disclosed by return filed by petitioner for the taxable year. These adjustments were as follows: Unallowable deductions and additional income: (a) Dividend income
$ 109.97
(b) Net operating loss carry-over
82,899.18
Petitioner does not contest adjustment (a). By *311 appropriate assignment of error he contests adjustment (b). That adjustment was explained in the statement which accompanied the deficiency notice as follows: (b) It is held that you are not entitled to the net operating loss carry-over claimed on your return in the amount of $82,789.21. Findings of Fact The petitioner is an individual residing at Malden, West Virginia. The return for the period here involved was filed with the Collector of Internal Revenue for the District of West Virginia. Petitioner files his income tax returns on the cash receipts and disbursements basis. On joint income tax return for the calendar year 1939 filed by petitioner and his wife deductions were claimed in the amount of $23,500 on account of petitioner's investment in the capital stock of Marine Coal Company, sometimes hereinafter referred to as Marine, becoming worthless and in the amount of $86,492.52 on account of debt due to petitioner from Marine Coal Company becoming worthless. Said return showed a net loss of $82,789.21. On his individual income tax return filed for the calendar year 1940 petitioner claimed a net operating loss carry-over from 1939 in the amount of $82,789.21. This loss *312 was disallowed in its entirety by the respondent on the ground that it was not attributable to the operation of a trade or business regularly carried on by petitioner. The parties stipulated that "If the Court should find that the loss sustained by the petitioner by reason of said stock and indebtedness having become worthless during the year 1939 was attributable to the operation of a trade or business regularly carried on by the petitioner within the meaning of Sec. 122 I.R.C. relating to net operating loss deduction, then petitioner is entitled to a net operating loss carryover deduction for 1940 in an amount equal to his net income for 1940 computed without such deduction and there is no deficiency of income tax due from petitioner for the year 1940." The petitioner is 68 years of age. He graduated from Virginia Military Institute in 1896, majoring in chemistry. Upon leaving school he went to work for his father who operated the salt works at Malden, West Virginia, and who owned large acreages of coal land in the southern part of West Virginia and was engaged in acquiring additional lands of the same character. Petitioner soon became active in the management *313 of the salt works and in that capacity operated a coal mine from which the salt works secured its fuel supply as early as 1901. He also began assisting his father in the acquisition and management of coal lands as soon as he left school and continued to do so over a period of some twenty-nine years until his father's death in 1925. Also, as early as 1901 petitioner began to invest his own money in the coal business, acquiring a stock interest in a coal company, which company he is still managing. In 1917 petitioner participated with his brother and another individual in the formation of a corporation, the Dickinson Fuel Company, for the purpose of selling coal from the mine owned by the company in which he had an interest and was managing as well as from such other mines as might be developed in connection with lands owned by petitioner and his family. Later, and prior to 1939, he acquired all of the stock of this sales company which sells four or five hundred thousand tons of coal annually. Petitioner has devoted some 40 years endeavoring to learn as much as he could about the coal business. He has been a director of the National Coal Association for perhaps 20 years, was its *314 president for three or four years and is a member of its executive committee. He has been a member for some 20 years of the Property Owners' Committee, an organization formed by owners of coal lands south of the Ohio River for the purpose of protecting their interests in the matter of freight rates on coal shipments. He also spent some time in connection with a number of Interstate Commerce Commission hearings over the past 20 years and testified at some of these hearings. This was done largely because of the interest which petitioner had or expected to have in coal lands in southern West Virginia. In 1923 petitioner's father, who then owned about 200 tracts of coal lands in southern West Virginia, comprising some 40,000 acres, conveyed these lands to a holding company, Bedford Corporation, and caused about 25 percent of the stock of the company to be issued to petitioner and a like amount to petitioner's brother in appreciation of their services over past years. The remainder of the stock was retained by the father and upon his death in 1925 petitioner inherited one-third of that interest which gave him 41 2/3 percent of the outstanding stock. Later upon the death of petitioner's *315 mother in 1930 petitioner's wife acquired 8 1/3 percent of the stock in said company, giving petitioner and his wife together 50 percent while petitioner's brother and his brother's wife owned the other 50 percent. In 1933 the stockholders dissolved this corporation and distributed its assets in kind to themselves. An appraisal of these lands was made at the time the corporation was dissolved and the undivided interests received by petitioner were valued at about $700,000. In 1929, the year in which petitioner organized the Marine Coal Company, stock in which became worthless in 1939, petitioner's holdings included the following: (a) Five-twelfths of the capital stock of Bedford Corporation. This was the landowning company referred to above which was dissolved in 1933. After the dissolution of Bedford Corporation this item represented five-twelfths undivided interest in about 40,000 acres of coal land. Some of these lands were under lease for coal mining purposes in 1929. Rents and royalties were received from said lands by petitioner following dissolution of the corporation. (b) Five hundred and fifty acres of land in Kanawha County, West Virginia, described as coal, gas and *316 residence property. (c) Five hundred and twenty acres of coal land in Cabin Creek District, Kanawha County, West Virginia. This tract was leased to Dry Branch Coal Company for coal mining purposes on a royalty basis in 1930 and from 1930 to 1937, inclusive, petitioner was credited with royalties in the amount of $25,976.96 therefrom. A considerable part of the coal mined from this tract was sold by Marine. (d) Eighty-seven and one-half percent of the capital stock of Leevale Collieries, Incorporated, a coal mining company located in Raleigh County, West Virginia, which began operating in 1929, produced 77,901 tons in 1939 and is now producing at the rate of about 125,000 to 150,000 tons per year. This corporation was organized by petitioner. He dominated and controlled its policies. The other 12 1/2 percent of the stock was owned by the general manager who has been with petitioner for 40 years. Petitioner never received any salary or dividends from this corporation. (e) Fifty percent of the capital stock of Dickinson Fuel Company. The remaining 50 percent of the stock of this company was acquired by petitioner from his brother in 1933. This is a coal sales company organized in *317 1917. Its sales now amount to 400,000 or 500,000 tons of coal per year. Dickinson Fuel Company in turn owns all of the capital stock of: (1) Black Band Coal Company, a coal mining company producing 140,000 to 150,000 tons of coal per year from some 5,000 to 6,000 acres of land in Washington District, Kanawha County, West Virginia, owned by it; (2) Colonial Fuel Company, a retail coal sales company in Columbus, Ohio, selling some 20,000 tons of coal per year; and (3) Kanawha Central Railroad Company, a short line located in Kanawha County, West Virginia, and serving the mine of Black Band and another mine. Petitioner dominated and controlled all of these corporations and determined their policies. Their general offices are located next to his own office. He gave them his personal supervision. The only compensation for services ever received by petitioner from any of these companies was a salary from Dickinson Fuel Company back in the early days before he acquired all of the capital stock. No dividends have been paid to him by any of them because petitioner felt that to do so would be like taking money out of one pocket and placing it in another. (f) All of the capital stock of Marine *318 Coal Company. This was a coal storage and sales company in Chicago and was organized by petitioner in 1929. He acquired all of the capital stock for $23,500. Prior to incorporation the business was operated in the name of C. C. Dickinson doing business as Marine Coal Company. Some trouble with labor racketeers in Chicago developed and petitioner thought he had better organize a corporation. It was organized as a matter of convenience and to avoid public liability. The sales offices of Marine were located in Chicago and the business was operated by a local manager. The corporation kept books of account and records. Marine filed Federal corporation income tax returns and a banking account was maintained in the name of the Marine Coal Company in a Chicago bank. All contracts entered into by the corporation were in the name of Marine Coal Company. Marine was a separate entity from that of its stockholders. Its purpose was to serve as an outlet into the Chicago and lake markets for coal from lands and mines owned by petitioner or by companies in which he owned a large percentage or all of the stock. Petitioner controlled the operation of this company and determined its policies; gave it *319 his personal attention and received no compensation for his services. Close to three-quarters of a million tons of coal were sold over this company's dock during its 10 years of operation from 1929 to 1939. From time to time petitioner loaned various sums of money to Marine to get it on its feet or keep it in business or furnish it with funds with which to do business. The stock of this corporation and the debts due from it to the petitioner became worthless in 1939 and were claimed as deductions by petitioner on his return for that year. (g) About 50 percent of the capital stock of Dry Branch Coal Company. This is a coal mining company which was producing approximately 50,000 to 100,000 tons per year during the period from 1929 to 1939. Petitioner was in complete control of this company, devoted his time and attention to it the same as he did his other companies, received no compensation for his services after 1929 and has received no dividends from it within the past 30 years. Between 1929 and 1940 properties acquired by petitioner included the following: (1) 2,801 acres of coal and land in Louden District, Kanawha County, West Virginia, adjoining property of Black Band Coal *320 Company, acquired October 2, 1937; and (2) all of the capital stock of Dixport Coal Company, a coal mining company in Kanawha County, West Virginia producing from 140,000 to 150,000 tons of coal per year from lands owned or leased by it and which are adjacent to land owned by petitioner and his brother. This company was organized by petitioner in 1933. He manages and controls it but receives no salary. The corporation has paid no dividends. One of the reasons for acquiring this company (or having the company acquire the property which it operates) was the fact that petitioner and his brother owned adjoining coal lands which could best be operated through the Dixport property. Petitioner never loaned money to any corporation other than ones in which he owned a controlling interest. He was not engaged in the business of promoting or financing corporations nor in the business of buying and selling stocks and securities. Opinion BLACK, Judge: There is little, if any, real dispute about the facts in the instant case. The parties are agreed that the stock which petitioner owned in the Marine Coal Company became worthless in 1939 and that this stock had a cost basis to petitioner of *321 $23,500. The parties are also agreed that in years prior to 1939 petitioner had loaned to Marine the sums of money which he claims and that the debt represented by these loans became worthless in 1939. The Commissioner allowed the losses to petitioner as deductions in 1939. He, however, refused to allow petitioner to carry forward the portion of these losses not used to offset petitioner's net income in 1939, as statutory net loss deductions under the provisions of section 122, I.R.C.
The Commissioner has determined that these losses which he concedes petitioner incurred in 1939 were not incurred in any trade or business regularly carried on by petitioner and, therefore, cannot be carried forward into the next succeeding year. Petitioner contends that this determination is in error and that he is entitled to the deduction of the statutory net loss which he claims under the provisions of sections 23 (s) and 122, I.R.C. The pertinent provisions of these sections are printed in the margin. [1]
*322 In support of petitioner's contention that the losses which he incurred in 1939 from his transactions with Marine were losses which he incurred in a business regularly carried on by him, petitioner relies upon such cases as Glenn M. Averill, 20 B.T.A. 1196, petition for review dismissed on motion of Commissioner, 53 Fed. (2d) 1079; T. I. Crane, 17 B.T.A. 720. These cases were decided prior to the decisions of the Supreme Court in Dalton v. Bowers, 287 U.S. 404 and Burnet v. Clark, 287 U.S. 410, and they can no longer be regarded as authority for the proposition which the petitioner urges in the instant case. In the Dalton case the Supreme Court stated in the following language the contentions which the taxpayer was making: The losses of the manufacturing corporation were not the losses of the taxpayers. They do not seek to disregard the corporate entity, but respect it. Taken as a whole, this entity constituted a part of the individual trade or business of Hubert Dalton. His trade or business was not merely that of inventing; it included exploiting of his inventions, putting them on a paying basis by developing, manufacturing, *323 improving, and selling them through corporations organized for that special purpose. All of these things formed a complete, comprehensive enterprise of which the corporation was part. It was an instrumentality of the taxpayer's business. Consequently, the investment in the corporate shares was part of business regularly carried on. Petitioner's argument in the instant case, as we construe it, is very much the same as that used by Dalton before the Supreme Court in Dalton v. Bowers, supra, except that petitioner was engaged in developing and exploiting his coal lands, whereas Dalton was engaged in exploiting his patents. The Supreme Court held that Dalton's argument which we have quoted above was invalid for the following reasons: Whether theoretically valid or not, this argument rests upon assumptions out of harmony with the facts disclosed by the record. Dalton was not regularly engaged in the business of buying and selling corporate stocks. He organized the manufacturing corporation, and took over all its shares with the intention of selling them at a profit. He treated it as something apart from his ordinary affairs, accepted credits for salaries as an officer, *324 claimed loss to himself because of loans to it which had become worthless, and caused it to make returns for taxation distinct from his own. Nothing indicates that he regarded the corporation as his agent with authority to contract or act in his behalf. Ownership of all the stock is not enough to show that creation and management of the corporation was a part of his ordinary business. Certainly, under the general rule for tax purposes, a corporation is an entity distinct from its stockholders, and the circumstances here are not so unusual as to create an exception. Petitioner's loss in the instant case from the loans which he had made to Marine must be treated in the same way as his loss from his investment in the stock of the corporation and for substantially the same reasons as used by the Supreme Court in Dalton v. Bowers, supra. See Burnet v. Clark, supra. Petitioner contends that Dalton v. Bowers and Burnet v. Clark, both supra, are distinguishable on their facts. While it is true that the facts which were present in those two Supreme Court cases are somewhat different from the facts of the instant case, the controlling principle is the same and we *325 must give recognition to that principle. Among the cases which have been decided by our Court and some of the United States Circuit Courts of Appeals since the Supreme Court decided Burnet v. Clark and Dalton v. Bowers, and which involved the same issue as we have here are: Winthrop Ames, 27 B.T.A. 729, affd. 68 Fed. (2d) 301; Samuel Lanski, 34 B.T.A. 1019; Stephenson v. Commissioner, 101 Fed. (2d) 33, certiorari denied 307 U.S. 647. In each of these cases the decision was for the Commissioner. It is true, of course, that the statutes involved were of other Revenue Acts than the Internal Revenue Code which is applicable to 1939 and subsequent taxable years. But the sections of the Internal Revenue Code which are involved in the instant case are substantially the same as were the sections of the statutes involved in the above-cited cases. Petitioner does not contend otherwise. His contention is, as we have already stated, that the cases are distinguishable on their facts. We do not think this is true. Therefore, for reasons which we have stated above, our decision on this, the only issue which has been submitted to *326 us, must be for the Commissioner. Decision will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * * * *
(s) Net Operating Loss Deduction. - For any taxable year beginning after December 31, 1939, the net operating loss deduction computed under section 122. SEC. 122. NET OPERATING LOSS DEDUCTION. (a) Definition of Net Operating Loss. - As used in this section, the term "net operating loss" means the excess of the deductions allowed by this chapter over the gross income, with the exceptions and limitations provided in subsection (d). * * * * *
(d) Exceptions and Limitations. - The exceptions and limitations referred to in subsections (a), (b), and (c) shall be as follows: * * * * *
(5) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall (in the case of a taxpayer other than a corporation) be allowed only to the extent of the amount of the gross income not derived from such trade or business. For the purposes of this paragraph deductions and gross income shall be computed with the exceptions and limitations specified in paragraphs (1) to (4) of this subsection.↩